**In the Matter of The ELI WITT CO., Debtor.**

**Bankruptcy No. 79–896.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

April 9, 1984.

 

James O'Neal, for W.C. Goolsby.

Francis Cobb, Tampa, Fla., for William L. Van Dyke, Jr.

William Zewadski, Tampa, Fla., Arthur Olick, for creditors committee.

C. Timothy Corcoran, Tampa, Fla., for debtor.

Shirley Arcuri, Tampa, for Walter Uffelman and James Birdwell.

## MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a pre-Code Chapter XI case and the matters under consideration are eight Applications to Reject Executory Contracts, filed by The Eli Witt Company (Eli Witt), a debtor involved in the above-captioned arrangement proceeding. Although the final evidentiary hearing on the Applications was held on two separate occasions, it is appropriate and proper to treat all the Applications under consideration in one combined order.

The record as established at the two separate evidentiary hearings is essentially without dispute and is primarily based on documentary evidence which reveals and indicates the following facts which are germane to the resolution of the issues under consideration in this matter.

Between 1964 and 1977, Hav-a-Tampa Corporation (Hav-a-Tampa), the predecessor in interest of Eli Witt entered into various agreements with certain high and medium level employees. These agreements fall generally into three separate categories which could be characterized as follows:

The first type of agreement was a consulting agreement entered into between Hav-a-Tampa and William L. VanDyke, Jr. on April 5, 1977 (Debtor's Exh. # 1). At the time the agreement was executed, William L. VanDyke, Jr. was the president and chairman of the Executive Committee of the Board of Directors of Hav-a-Tampa. The agreement provided that VanDyke shall serve as a consultant for a period of five years; that is, from April 15, 1977 to April 15, 1982, and shall be compensated $50,000 per year as a consulting fee to be paid in monthly installments. The agreement further provided that at the expiration of the five year period, Mr. VanDyke will be entitled to retirement benefits in the amount of $20,000 per year until he reached the age of 65 or until his death. The agreement further provided that at the age of 65, Mr. VanDyke will receive the regular retirement benefits in accordance with the company's pension plan. As consideration for the agreement, Mr. VanDyke agreed to retire early and not to compete with Hav-a-Tampa. It is without dispute that Hav-a-Tampa and its successor, Eli Witt, made the monthly payments under the agreement until June, 1979 at which time the total amount which VanDyke had received under this agreement was $110,399. The total amount remaining unpaid under the contract is $227,859 and the accrued payments up to the date of the trial were $136,644.

The second type of agreements are labeled and described as "Deferred Compensation Agreements." They were executed between Hav-a-Tampa and five Hav-a-Tampa employees. According to these agreements, Hav-a-Tampa agreed to make monthly payments to the individual employees, who in turn agreed to retire early, agreed not to compete with Hav-a-Tampa and also agreed to stand by and be available to serve as consultants if requested. The first agreement in this category involves a deferred compensation agreement between Hav-a-Tampa and A. Lee Cannon, executed on January 1, 1976. This agreement provided for a compensation for Cannon of $977 per month until the age of 65 or until his death (Debtor's Exh. # 6). Cannon did receive a total payment of $41,034 with the amount of $62,528 remaining unpaid under the contract. As of the date of the trial, the amount of $35,172 was accrued, but unpaid under the agreement. An identical agreement was executed be-

tween Hav-a-Tampa and Raleigh G. Mosely on October 4, 1976. This agreement provided for a monthly payment to Mosely of $720 or for a total amount of $39,600 (Debtor's Exh. # 3). Mosely was, in fact, paid $24,480 which left $15,120 remaining unpaid which became due under the agreement as of the date of the trial.

The third agreement was entered into between Hav-a-Tampa and Walter Uffelman, Jr. on July 1, 1977 which provided for the monthly payments of $1,248.06 (Debtor's Exh. # 5). According to the terms of the agreement, the sum of $46,166 was in fact paid with $29,952 remaining unpaid and $28,704 accrued and not paid as of the date of the trial.

On August 1, 1977, Hav-a-Tampa entered into the same agreement with W.C. Goolsby and agreed to commence monthly payments to Goolsby in the amount of $866.66 (Debtor's Exh. # 4). It is without dispute that Goolsby was paid, in fact, the total amount under the agreement of $29,466 which left $19,933 remaining unpaid under the contract, all of which was due at the time of the trial.

The last agreement under consideration in this category was executed by Hav-a-Tampa on January 1, 1978 with James Birdwell (Debtor's Exh. # 2). This agreement provides that Hav-a-Tampa will pay a monthly amount of $1,500 up to and including April, 1982; and from May, 1982 up to and including April, 1987, this amount shall be reduced to $1,000. It is without dispute that Birdwell did receive $27,000 with $105,000 remaining under the agreement and as of the trial, $51,000 was also due and owing.

While all of the foregoing agreements were reduced formally to an agreement and a contract, the agreements in the third category are based on two letters of commitment issued by Hav-a-Tampa to former employees. A letter to N.W. Wilkins which was dated November 6, 1974 (Debtor's Exh. # 6) agrees to pay invoices presented to Hav-a-Tampa quarterly in the amount of $1,500. Mr. Wilkins was paid $29,000 and was owed at the date of the trial the sum of $18,000. The last agreement sought to

be rejected by Eli Witt is based on a letter from Hav-a-Tampa to John D. Williams dated August 24, 1976 (Debtor's Exh. # 8). According to this letter, Williams was to receive $75 per month for life. Mr. Williams did in fact receive $2,700 pursuant to this agreement, and the sum of $1,800 remains due and owing. This amount was calculated from June, 1979 when payments were terminated until June 1, 1981, the date Mr. Williams died.

It is without dispute that no payments have been made under any of the eight agreements since Eli Witt filed this Petition for Relief under Chapter 11 on June 29, 1979 and each of the former employees, with the exception of Williams opted for early retirement and did, in fact, retire after Eli Witt ceased payments under the agreements.

All the foregoing agreements were entered into by Hav-a-Tampa and the respective employees, and it is without dispute that Eli Witt is now the successor in interest of Hav-a-Tampa as a result of an antitrust litigation which compelled Hav-a-Tampa to divest itself of Eli Witt, the distributing arm for tobacco products manufactured by Hav-a-Tampa. Upon divestiture, Eli Witt expressly assumed all contractual obligations and liabilities regarding the employees of Hav-a-Tampa who actually worked in the Eli Witt distribution division prior to divestiture. Thus, there is no doubt that Eli Witt is actually the party who is responsible for the contractual obligations which are at issue here and which were originally undertaken by Hav-a-Tampa.

It is the contention of the former employees that the respective agreements are not really executory contracts susceptible to rejection; that they remain a continuing obligation which is binding on Eli Witt; and that they are entitled to payment according to the terms of the respective agreements. It is Eli Witt's position, of course, that all of these contracts are executory in nature; that by virtue of a specific provision of the Act of 1898, this being a pre-Code case, Eli Witt has a right to reject these contracts;

and that damages, if any, caused by the rejection shall be treated as nothing more than general unsecured claims to be dealt with under the confirmed plan of arrangement.

While the concept of rejecting a contract, executory or otherwise, is contrary to the principles of normal contract law, it is a well established principle founded in early decisions, that a trustee need not accept burdensome or unprofitable property, but may instead abandon the same. *See*, Quittner, *Franchises in Bankruptcy: Termination, Rejection and Assumption*, 89 Com. L.J. 83 (1984). This doctrine of abandonment was actually codified during the depression years of 1933 and 1935. *See*, *Quittner*, *supra* citing Countryman *Executory Contracts in Bankruptcy, Part I*, 57 Minn.L.Rev. 439 (1973). Cook, *Judicial Standards for Rejection of Executory Contracts in Bankruptcy Code Reorganization Cases*, 1980 Annual Survey of American Law, 689. The right to reject or assume executory contracts was recognized by and first received attention from Congress by revision of Section 77 of the Bankruptcy Act of 1935 (49 Stat. 911) and by the addition of Section 77(b) (added in 1934) both of which dealt with corporate or railroad reorganizations, but not ordinary bankruptcy cases. The general revision of the Bankruptcy Act of 1898 through the Chandler Act enacted in 1938 added a new § 70(b) to the Act which Section provided for the assumption or rejection of the executory contracts by a trustee within a specified time period, however, the Bankruptcy Act of 1898 failed to provide any definition of the term "executory contract."

It is noteworthy to mention at this time that the *Report of the Commission on the Bankruptcy Laws of the United States* published in 1973 by the Commission appointed pursuant to a joint resolution of Congress after two years of study, stated, "... the term 'executory contract' should not be defined. Its general meaning is well understood, and any succinct statutory language risks an unintended omission or inclusion. Instead, a proposed Act clearly should indicate the treatment of certain incompletely performed agreements..." (*Commission Report*, pp. 198–199); *see*, *Quittner*, *supra* at 84. Thus, it is not surprising that what is and what is not an executory contract has been subject to much debate. It should be stated, however, that Professor Countryman furnished the first precise pragmatic approach to define the nature of executory contracts. According to Countryman, "[t]he concept of the 'executory contract' in bankruptcy should be defined in the light of the purpose for which the trustee is given the option to assume or reject. Similar to his general power to abandon or accept other property, this is an option to be exercised when it will benefit the estate. A fortiori, it should not extend to situations where the only effect of its exercise would be to prejudice other creditors of the estate." Countryman, *supra*, 450–451.

The Countryman definition basically depends on two key points and could be reduced into simplest terms as follows: "[A] contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance by the other." Countryman, *supra* at 450–451. This definition appears to be simple, crystal clear and concise, but, of course, it does not work in every situation and has not been followed in certain situations by courts. *See*, Quittner, *supra* at 85, discussion of *In re Harms*, 10 B.R. 817, 7 B.C.D. 671, 4 C.B.C.2d 691 (Bkrtcy.Colo.1981). *In re Select-A-Seat Corp.*, 625 F.2d 290 (9th Cir. 1980). Nevertheless, this Court is satisfied that Countryman's definition is suitable in the present instance.

Thus, applying the test of Professor Countryman, there is no question that the contracts currently under consideration are purely executory contracts susceptible to rejection by the Debtor. The former employees under these contracts agreed to abstain from competing for a stated period and were to be available for consultation if requested. On the other hand, Hav-a-Tampa and its successor, Eli Witt, was required to make payments in consideration for

these covenants. In addition, there is no doubt that a breach by the former employees either by refusal to be available for consultation or by engaging in competition with Eli Witt would have excused any further performance on behalf of Eli Witt. Conversely, there is no question that refusal by Eli Witt to continue to make the payments according to terms of the agreements would have excused the employees of their obligation not to compete or to render consulting services when requested.

The difficulty with this case, however, is that at first blush the promises not to compete appear basically illusory because of the unequal economic position of the parties; and the promises to be available for consulting services were, in fact, with one exception, illusory. For instance, with the exception of Mr. VanDyke who was a high level executive and who conceivably could have furnished meaningful assistance in the further management of Eli Witt, the balance of the former employees were low level employees, regional managers, whose consulting services would have conferred minimal benefit, if any, to the corporation. However, based on the circumstances which existed when the agreements were executed by Hav-a-Tampa and the employees, it is clear that the covenants not to compete were anything but illusory. Each of the employees was knowledgeable in the mechanics of a distribution operation, but more important, each had established relationships with accounts in his particular territory. Thus, by either striking out on his own, or by affiliating with a currently operating competitor of Eli Witt, these employees could have caused serious economic injury to Hav-a-Tampa.

■ The evidence clearly established that the consultation provision of these agreements was hardly meant to be significant or important, with the exception of Mr. VanDyke. There is no doubt, however, that the non-compete provisions of these agreements held significant economic importance to Eli Witt and that the breach of those provisions would have certainly justified Eli Witt to terminate all compensations under the agreements. This being the case, it is clear that under the Countryman

definition, these are in fact executory contracts and therefore susceptible to rejection.

■ This leaves for consideration the legal ramifications flowing from the rejection, if permitted by this Court; that is, the entitlement of these parties to establish a claim which is in a higher level than those of other general unsecured claimants. There is no question that damage claims arising from the rejection of executory contracts are not entitled to be treated as cost of administration items because such treatment is only accorded to claimants who contributed to the preservation of the properties of the estate. *See*, § 365(g)(1); § 503. While this is a pre-Code case, there is no significant departure of the concept of cost of administration between the old § 64(a)(1) of the Act of 1898 and as that term is employed and used by the Bankruptcy Code, 11 U.S.C. § 503. This being the case, this Court is satisfied that these are executory contracts subject to rejection; that they are clearly burdensome; that on the date of filing, the contracts presented no significant benefits to the Debtor; and, that these parties, formerly employees of Eli Witt and Hav-a-Tampa respectively, are entitled to file claims for damages for amounts promised, but not received under the contracts, which claims shall be treated as general unsecured claims to be paid according to the terms of the confirmed arrangement.

A separate final order shall be entered in accordance with the foregoing.